Franklin P. SHAW, Jr.

v.

The UNITED STATES.

No. 49–79.

United States Court of Claims.

Jan. 28, 1981.

Paul A. Kiefer, Washington, D. C., atty. of record for plaintiff. Kiefer & Brooks, Washington, D. C., of counsel.

Nancy R. Sills, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and NICHOLS and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This civilian pay case is before the court on cross-motions for summary judgment. Plaintiff, a government employee in a policymaking position, challenges his dismissal from his GS–18 appointment on procedural, constitutional, and contractual grounds. We hold for defendant.

I

During the fall of 1973, plaintiff Franklin P. Shaw applied and was selected for the career executive position of Deputy Assistant Secretary of Defense (Regional Programs) in the Office of the Assistant Secretary for Program Analysis and Evaluation, Department of Defense. Plaintiff thereupon burned his bridges. He disposed of his Connecticut home and moved to Washington, D. C. He abandoned his employment in a private company to which he cannot now return. Plaintiff's qualifications for career appointment were submitted to and approved by the Civil Service Commission (CSC) in March 1974. Shortly thereafter, the Department of Defense sought approval from the CSC to redesignate the deputy assistant secretary position to noncareer executive assignment. The requested change was approved. Plaintiff was fully aware of the impact this might have on his job security, and protested ac-

cordingly, but to no avail. Plaintiff accepted the noncareer appointment on July 1, 1974, under protest but without cognizable coercion or duress.

Early in January 1978, plaintiff received a memorandum from Assistant Secretary of Defense Russell Murray notifying him that he would be removed from his position after 30 days. This was actually the second attempt to remove plaintiff following the change in administration. An earlier attempt, which began with a notice to plaintiff of proposed removal on April 4, 1977, was overturned by the Federal Employee Appeals Authority for reasons not stated in the parties' briefs. The January 1978 letter stated that due to the "policy-determining" nature of plaintiff's position, the incumbent was required to be an individual "suitable to his superiors" and one who is best able to determine the policies of the Department, and with the change of administration, plaintiff's relationship in that regard had ceased to exist. On January 20, 1977, the administration of the executive departments had changed from President Ford to President Carter.

As advised by the assistant secretary, plaintiff submitted his written reply to the removal notice on January 19, 1978, and also requested the opportunity to respond orally. Plaintiff wrote that the redesignation was "arbitrary," a "breach of faith" and occurred after he "was fully committed" and "had little recourse in the matter at the time." On February 8, 1978, Secretary of Defense Harold Brown designated Deanne C. Siemer, General Counsel of the Department, to hear plaintiff's oral reply. Plaintiff met with Ms. Seimer on February 21, 1978, and in a memorandum dated March 3, 1978, Ms. Seimer recommended approval of the proposed removal. The decision to remove, signed by Secretary Brown, was issued on March 15, 1978.

Plaintiff appealed his removal to the CSC's Federal Employee Appeals Authority (FEAA) on May 25, 1978. The FEAA found that the Department of Defense had complied with all of the procedural requirements of the law and Civil Service regula-

tions in effecting plaintiff's removal. The FEAA further refused to review the claimed breach of contract and held that the decision to convert a position from career to noncareer was also not an appropriate subject for its review since the need for such positions is a management decision and prerogative. Finally, the FEAA sustained the reason for removal of plaintiff as an action that will "promote the efficiency of the service."

## II

Plaintiff argues that his removal was procedurally defective for several reasons. First, because the notice of the proposed removal was not stated with sufficient particularity to apprise him of the allegations that he would have to refute and acts that he would have to justify. Coupled with this is the argument that defendant further failed to make available to the plaintiff any of the evidence that was relied on by defendant in deciding to remove plaintiff. Only what was purported to be reasons for the removal were stated and none of the evidence relied on by defendant to support those reasons was given. And so plaintiff argues that he was removed on the basis of an "unsworn, undocumented and vague allegation."

■ The position of deputy assistant secretary in the Office of Program Analysis and Evaluation is a noncareer executive assignment (NEA). A noncareer executive assignment is in the excepted service and so an employee serving under such an assignment does not acquire a competitive status. 5 C.F.R. § 305.603. A NEA employee may be removed "when the qualifications or relationships required for the assignment change or cease to exist." 5 C.F.R. § 305.604. The January 1978 notice of proposed removal is procedurally sufficient to terminate a NEA employee as it explained that the position in question was policy-determining in nature and with a change in administration, plaintiff no longer had the confidence of his superiors and was no longer suitable to them. In this instance it is obvious that the relationship in question had changed and ceased to exist.

■ However, plaintiff is entitled to additional procedural protections since he is a veteran and therefore the Veterans Preference Act, 5 U.S.C. §§ 7511–7513 (Supp. II 1978) applies. Specifically, plaintiff was entitled to—

§ 7513. Cause and procedure

\*    \*    \*    \*    \*    \*

(1) at least 30 days' advance written notice, \* \* \* stating the specific reasons for the proposed action;

(2) a reasonable time, \* \* \* to answer orally and in writing \* \* \*;

(3) to be represented by an attorney or other representative;  and

(4) a written decision and the specific reasons therefor at the earliest practicable date.

In plaintiff's motion for summary judgment now before the court, he raises arguments only concerning subsection (1). He contends that the notice he received was procedurally defective. Plaintiff argues that this court has interpreted the notice provisions of the act so as to require that a notice of proposed removal must be stated with such detail and specificity that an employee may be able to refute allegations made against him. He cites *Burkett v. United States*, 185 Ct.Cl. 631, 402 F.2d 1002 (1968) to support this position.

While it is true that the purpose of the provision in question is to afford an employee a fair opportunity to oppose his removal in an informed manner, yet on inquiry into the sufficiency of notice, the facts and circumstances of a particular case are regarded as important. *Engelhardt v. United States*, 125 Ct.Cl. 603, 606 (1953). And the facts and circumstances of this case are easily distinguishable from *Burkett*.

In *Burkett*, the plaintiff employee was a veteran formerly employed by the Department of Defense, who was removed on charges of having made malicious statements against his immediate superior with the intent to harm or destroy the superior's reputation, authority, or official standing. This court held that the charges in that case

had to be supported by detail containing just what statements were made, the names of the persons to whom made, and details to support the element of malicious intent and the harm which the accused intended to inflict.

In the instant case plaintiff has not been charged with any misconduct (as in *Burkett*), malfeasance or nonfeasance. To the contrary, his notice of removal was explicit in explaining that plaintiff was removed solely because he no longer had the confidence of his superiors. Indeed in her memorandum to the Secretary of Defense regarding plaintiff's proposed removal, the General Counsel stated, "[t]he professional qualifications of Mr. Shaw have not been challenged. However, as the incumbent of this position, he must have the confidence of his immediate superior, Mr. Murray. The absence of that confidence is a valid basis for his removal." (Plaintiff's exhibit C, p. 2.) Yet plaintiff argues that the notice is impermissibly vague because it does not state which superiors do not have confidence in him, and which policies and for which department the notice refers. This argument is not tenable. Plaintiff surely knows from which department he was terminated. He must understand also the policies with which his department was concerned, and to that end his notice of removal contained an enclosure describing the nature and purpose of the work, policies, issues, and problems his position was responsible for. As to which superiors were involved, the enclosure also specifically said that the incumbent of plaintiff's position must enjoy the personal trust and confidence of the Assistant Secretary of Defense for Program Analysis and Evaluation and the Secretary and Deputy Secretary of Defense.

A case which is more similar factually to the instant case than *Burkett*, and which is cited by defendant is *Leonard v. Douglas*, 321 F.2d 749 (D.C.Cir. 1963). In *Leonard*, the appellant was a Navy veteran attorney employed as first assistant to the Assistant Attorney General, an excepted position in the Justice Department's Civil Division. Subsequent to the appointment of a new Assistant Attorney General, the appellant was discharged because his confidential relationship with his superiors had ceased to exist. Appellant contested his removal alleging that the reason given for his dismissal did not constitute "cause" under the Veterans Preference Act. The United States Court of Appeals for the District of Columbia Circuit held that notwithstanding the appellant's unquestioned professional competence, his position gave him an input as to policy and since appellant did not have the confidence of his superiors there was sufficient "cause" within the Veterans Preference Act for his removal, without more. We find *Leonard* persuasive.

The second half of this procedural argument, that defendant failed to provide to plaintiff evidence to support the reasons for termination, is also not convincing. Plaintiff does not argue that defendant withheld evidence, only that defendant failed to provide any. And the government maintains that there was no additional material relied on by the Assistant Secretary as none was needed. So plaintiff's argument must fail since the government need not come forward with that which does not exist and is not required to exist.

■ The final procedural challenge raised by plaintiff is to the appointment of General Counsel Deanne C. Seimer to hear his oral reply. Plaintiff contends that his hearing before the General Counsel was a ritual because Ms. Seimer had decided to recommend his removal before the hearing. This claim however is not substantiated by plaintiff. Mr. Shaw also seeks to challenge the qualifications of the General Counsel to hear his oral reply. Mr. Shaw did not raise this objection at any time during his appeal to the CSC's FEAA. And this court has held any number of times, and it is a well established rule that issues not raised before the CSC may not be raised in this court for the first time. *Grover v. United States*, 200 Ct.Cl. 337, 345 (1973); *Haynes v. United States*, 190 Ct.Cl. 9, 418 F.2d 1380 (1969); and *Pine v. United States*, 178 Ct.Cl. 146, 149, 371 F.2d 466, 467–68 (1967). The selec-

tion of such a high level person as "oral reply officer" would seem, moreover, to accord well with the spirit and purpose of the requirement.

The essence of Mr. Shaw's position underlying his procedural arguments, is this: He admits he could be removed as indeed, by his own case, he knew from the first, yet he would somehow parlay his procedural rights as a veteran to compel his superiors to put before him some sort of bill of particulars. What had happened specifically to cause the loss of confidence? Why did they lose confidence in him and not in A, B, and C? It is understandable to the court that inability to generate a conversation on such matters might induce a feeling in the victim like one of Kafka's heroes, or of the prophet Job, who said "would that mine enemy had written a book," meaning, let me know what I am accused of. It may be admitted that "loss of confidence" is more a polite formula than a nugget of useful information. Nevertheless, the Congress, in enacting the Civil Service laws, has always been careful to avoid the practice of some foreign countries, where cabinet level officials, ostensibly heads of departments, are hamstrung by being denied other than permanent career subordinates. Our system, with our competitive career service, allows also for numerous noncareer policy aides who may be brought in and moved out at will, though not of cabinet stature or even next below. It would be profoundly inimical to our system to exact the bill of particulars Mr. Shaw now wants and allow him to debate this or that item of it with an "oral reply officer" or administrative judge. The "loss of confidence" formula spares the agency the necessity of throwing mud at unwanted advisers and spares them the hazard of being the targets of such mud. The stigma of removal for cause from the "competitive" service does not attach to Mr. Shaw, and if any future employer wants to know why he was removed, he need only point to the sequence of dates.

### III

■ In *Fiorentino v. United States*, 221 Ct.Cl. ——, 607 F.2d 963 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980), we held that dismissal of a Schedule C employee, a nonveteran, implicates under the due process clause neither "property" nor "liberty" interests. Unless Mr. Shaw's case is different because he is a veteran, the precedent is dispositive of due process issues. Two constitutionally based arguments are nevertheless raised by plaintiff to assert that his removal was improper. The first is that the defendant violated plaintiff's due process rights under the fifth amendment because with a change in administration, as a matter of law, it does not automatically follow that the confidential relationships referred to in the notice of proposed removal change or cease to exist. This particular argument was put forth by the plaintiff in a most cryptic manner. However, we will assume that plaintiff means that his dismissal was the result of a conclusive or permanent and irrebuttable presumption contrary to fact and therefore violative of fifth amendment due process. (*See generally United States Department of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973) and *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973)).

Plaintiff argues that defendant relied upon the presumption that with the change in administration "everyone in noncareer executive positions is unsuitable and not best able to determine policy." This bald assertion by plaintiff is gross and misleading, factually unsubstantiated by plaintiff and contrary to the record before the court, which reveals that the Department of Defense under Mr. Brown did not presume that everyone holding over in plaintiff's type of position was unsuitable.

■ Secondly, plaintiff submits that his separation impinges on his first amendment rights of free association. Since the defendant relied on a change in administration to justify or explain Mr. Shaw's termination, plaintiff says that his constitutionally protected right to free association has been unnecessarily restricted. We do not think defendant intended by its reference

to the change of administration to imply that the right to change policy advisers for "loss of confidence" was in limbo except after a change had occurred in occupancy of the oval office. We are of the view that it is exercisable at any time.

The issue of patronage dismissals, while certainly not a new problem, has been raised recently in a number of cases. While it has been found generally that patronage removals are constitutionally invalid, they are proper where the position in question involves policymaking. *See Elrod v. Burns*, 427 U.S. 347, 367–68, 96 S.Ct. 2673, 2686–87, 49 L.Ed.2d 547 (1976)—

A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate. The justification is not without force, but is nevertheless inadequate to validate patronage wholesale. Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end. Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party.

\* \* \* \* \* \*

\* \* \* An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. \* \* \*

There can be no doubt but that the Deputy Assistant Secretary of Defense position was policymaking in nature and involved formulating plans for implementing broad goals. The following description of the position comes from the office of the Assistant Secretary of Defense:

The incumbent will serve as Deputy Assistant Secretary of Defense (Regional Programs) with responsibility for formulating, developing and advocating Secretary of Defense and Administration policies with respect to the fiscal and resource aspects of the total defense program which implement the Administration's position on these matters. Because of the high level of Administration, public and Congressional interest in these policies, as well as the immediate and far-reaching impact of his recommendations on critical national defense issues, the incumbent of this position must apply an intimate knowledge of Administration policies, goals and commitments. He will be personally involved in formulating and developing Administration policy and the Nixon Doctrine to strengthen regional military cooperation. He must enjoy the personal trust and confidence of the ASD (PA&E) and the Secretary and Deputy Secretary of Defense. He will have a close and confidential working relationship with the Secretary of Defense and key policymaking personnel in the Administration.

\* \* \* Current Administration policy matters being formulated and developed by the incumbent include: the extent and nature of military support to specific foreign countries such as Israel, Iran, Korea, etc.; the stationing of U. S. troops and basing requirements in foreign countries; specific subjects to be discussed in Mutual Balance Force Reduction negotiations (i. e. the level and composition of U. S. and Allied forces that might be employed in Europe, the balance between NATO/Warsaw Pact forces, the improvement of U. S. and Allied forces, the Allied defense expenditure and the balance of payments as related to Europe); and levels of Allied defense burden-sharing.

It is worth noting as a brief aside that the policymaking label has significance apart from patronage dismissals challenged on first amendment grounds. The Supreme Court held in *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), that a state may require citizenship

as a qualification for officers who participate directly in the formulation, execution, or review of broad public policy. However, "* * * a flat ban on the employment of aliens in positions that have little, if any, relation to a State's legitimate interest, cannot withstand scrutiny under the Fourteenth Amendment." *Id.* at 647, 93 S.Ct. at 2850.

More recently the Supreme Court held in *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), that it is not the label of "policymaker" or "confidential" that is determinative but rather, " * * * the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. at 1295. In *Branti,* two Republican public defenders proved that they were discharged solely because they were not affiliated with the Democratic Party and the District Court, Court of Appeals, and U. S. Supreme Court found that their dismissals violated the first and fourteenth amendments. Our holding here raises no problem of reconciliation with *Branti* since plaintiff in our case is a Democrat who was hired by a Republican administration and dismissed by a Democratic administration. At no point in the proceedings before this court has it been alleged that plaintiff's party affiliations or political beliefs were a factor in his dismissal, or that the party in power could not dismiss its own partisans as policy advisers if it so desired. And as in *Committee for Protection of First Amendment Rights of Department of Agriculture Employees v. Bergland,* 434 F.Supp. 314, 320 (D.D.C.1977), there is no showing that the employee could have remained by changing party affiliation or that the Assistant Secretary attempted to require employees to associate with his political party. As in the above case, plaintiff here has not established an infringement of any constitutionally guaranteed rights.

### IV

■ In plaintiff's petition to the court he alleged in Count VI that the actions of the defendant in changing plaintiff's position from career to noncareer executive was a breach of contract. This point was not repeated in plaintiff's brief in support of his motion for summary judgment now before us and is apparently abandoned. However, we would be remiss if we failed to point out that in cases like the one before us, the law is well settled that, "public employment does not, * * * give rise to a contractual relationship in the conventional sense." *Urbina v. United States,* 192 Ct.Cl. 875, 881, 428 F.2d 1280, 1284 (1970). *See Crenshaw v. United States,* 134 U.S. 99, 10 S.Ct. 431, 33 L.Ed. 825 (1890); *Borak v. United States,* 110 Ct.Cl. 236, 78 F.Supp. 123, *cert. denied,* 335 U.S. 821, 69 S.Ct. 43, 93 L.Ed. 375 (1948). Therefore, plaintiff may not base his theory of recovery on contract law since he was a federal employee. Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not *ipso facto* create a contract liability running from the Federal Government to the employee, as they might if the employer were not the government. Mr. Shaw's claim, so far as founded on contract, is shown by the instant record to be moral, not legal.

### V

Plaintiff moves the court for an order remanding this case to the Merit Systems Protection Board for it to consider (1) the oral reply officer's qualifications, and (2) whether the government must offer evidence to prove that plaintiff was not suitable to his superiors. Plaintiff's motion for remand is denied. There are no factual issues involved herein that would necessitate a remand and plaintiff has missed his chance to raise an alleged administrative, procedural error, see discussion, *supra.*

It is concluded that plaintiff's motions for remand and for summary judgment are denied and defendant's motion for summary judgment should be and hereby is granted, and the petition is dismissed.